# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DANIELA MONRROY GUERRERO,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **No. 15 C 2422** |
| | ) | |
| **RAUL ESTEBAN OLIVEROS and** | ) | **Chief Judge Rubén Castillo** |
| **MARIA MARGARITA CABRERA,** | ) | |
| **a/k/a Maria Licea,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM OPINION AND ORDER

Daniela Monrroy Guerrero ("Petitioner") brings this action for the return of her seven-year-old daughter ("J.O.") and three-year-old son ("M.O.") (collectively, the "Children") to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* Petitioner claims that the Children's father, Raul Esteban Oliveros, and their paternal grandmother, Maria Margarita Cabrera Garcia, (collectively, "Respondents") wrongfully retained the Children in the United States in violation of the Convention and ICARA. Respondents assert several affirmative defenses under the Convention. The Court held an evidentiary hearing on these matters on June 11, 2015, and allowed the parties to submit post-hearing briefs in support of their positions. For the reasons stated below, the Court grants the Petition and orders the prompt return of the Children to Mexico.

## FINDINGS OF FACT

Petitioner is a citizen of Mexico. (Tr. at 06:19-20.) Oliveros is a citizen of the United States, and Cabrera is a citizen of Mexico and permanent resident of the United States. (*Id.* at 81:13-15, 65:04-06; Resp'ts' Hr'g Ex. 1, Oliveros's Birth Certificate; Resp'ts' Hr'g Ex. 2, Cabrera's Lawful Permanent Resident Card.) Petitioner and Oliveros started dating in May 2004 when Oliveros was vacationing in Mexico. (Tr. at 07:04-15.) Their relationship progressed, and in September 2006, Petitioner moved to the United States in order to live with Oliveros. (*Id.* at 08:04-13.) On June 3, 2008, Petitioner's and Oliveros's daughter, J.O., was born in Chicago. (*Id.* at 09:07-17; Pet'r's Hr'g Ex. 1, J.O.'s Birth Certificate.) After J.O. was born, Petitioner stayed at home to care for her while Oliveros worked; Petitioner returned to work when J.O. turned three. (Tr. at 10:12-19.) The couple's son, M.O., was born in Chicago on June 23, 2012. (*Id.* at 10:20-25; Pet'r's Hr'g Ex. 2, M.O.'s Birth Certificate.)

Oliveros testified that during the period of time they lived together in the United States, Petitioner was a good mother. (Tr. at 95:07-09.) Oliveros trusted Petitioner to stay home and take care of both J.O. and M.O.; he did not believe that Petitioner would hurt the Children. (*Id.* at 82:10-24.) For four months while they were in Chicago, Petitioner, Oliveros, and J.O. lived with Cabrera. (*Id.* at 66:13-16, 70:22.) Cabrera testified that during that time, she did not have any concerns that Petitioner would harm J.O. (*Id.* at 67:03-07.)

On September 19, 2012, three months after M.O. was born, Petitioner traveled with the Children from Chicago to Mexico. (*Id.* at 11:14-20.) Oliveros paid for their plane tickets. (*Id.* at 12:09-11, 83:07-09.) The parties disagree over the circumstances surrounding Petitioner's and the Children's departure. Petitioner testified that Oliveros told her to go to Mexico with the Children and that he would join them in Mexico in a few months. (*Id.* at 11:23-12:18, 12:12-20.)

2

Petitioner testified that Oliveros wanted to marry her in Mexico; Oliveros explained to Petitioner that if they got married in Mexico, it would be easier for her to return to the United States and obtain her residency. (*Id.* at 11:24-25.) Petitioner testified that she first learned that Oliveros was not going to join her and the Children in Mexico on December 25, 2012. (*Id.* at 12:24-13:01.) On that day, Oliveros called Petitioner and told her that he was living with another woman, that he was no longer going to come for her and the Children, and that she should not expect to return to the United States. (*Id.* at 13:05-09.) Oliveros did not request that the Children return to Chicago, nor did he request custody of the Children at that time. (*Id.* at 13:11-15.)

Oliveros, on the other hand, testified that he and Petitioner discussed marriage at the beginning of their relationship. (*Id.* at 74:21-22.) However, at the time M.O. was born, Oliveros claimed that he and Petitioner were already separated and that they slept in different bedrooms. (*Id.* at 75:03-04.) Oliveros testified that he told Petitioner that their relationship was not "going anywhere." (*Id.* at 75:04-05.) Oliveros said that one day after he got home from work, Petitioner told him that she had spoken with her mother and that her mother wanted to speak with him. (*Id.* at 75:06-08.) Oliveros then called Petitioner's mother, at which time she asked him to send Petitioner and the Children to Mexico; she reassured him that the Children would be well taken care of. (*Id.* at 75:08-10.) Oliveros testified that at that point, he and Petitioner were on the "same page" regarding their breaking up. (*Id.* at 75:11-14.) Oliveros denied telling Petitioner that if she went to Mexico, he would join her and marry her. (*Id.* at 75:18-20.) Instead, Oliveros claimed that he told Petitioner that they could re-evaluate their relationship status when he came to visit the Children in Mexico. (*Id.* at 75:20-23.) Oliveros testified that he

did not object to Petitioner and the Children traveling to and living in Mexico in September 2012. (*Id.* at 83:10-15.)

From September 2012 through February 2014, Petitioner and the Children lived with Petitioner's parents in Las Palmas, Jalisco. (*Id.* at 12:06-08, 13:19-21.) Oliveros sent Petitioner money (about $250) every two weeks to help care for the Children. (*Id.* at 13:22-25, 76:12-14; Resp'ts' Hr'g Ex. 3, Wire Transfer Receipts.) Petitioner testified that she used these child support payments for milk and diapers; she denied spending the money on alcohol and clothes for herself. (Tr. at 31:10-17.) In June 2013, Petitioner began working at a car rental place. (*Id.* at 07:01-03, 15:08-10.) While Petitioner was working, J.O. attended preschool and M.O. went to day care. (*Id.* at 14:12-17, 15:19-23; Pet'r's Hr'g Ex. 3, Certificate of Studies.) Petitioner testified that J.O. generally received positive evaluations in school. (Tr. at 31:04-05.) She said that J.O. made friends at school and also had friends in the neighborhood with whom she played outside. (*Id.* at 32:08-15.) J.O. also attended dance classes and was involved in religious education. (*Id.* at 31:19-32:04.) Petitioner testified that J.O. and M.O. were close with their maternal grandparents and other family members that lived nearby. (*Id.* at 31:05-09.)

Petitioner testified that she and her father used to spank J.O. on the bottom only to discipline her. (*Id.* at 34:16-25.) Petitioner denied that her boyfriend ever hit J.O. (*Id.* at 35:01-07.) Petitioner also denied allowing her boyfriend or any other men to sleep in the same bed as the Children. (*Id.* at 35:08-10.) Petitioner admitted to posting a photograph of M.O. holding a bottle of beer on Facebook, but claimed he was only holding the beer as a joke. (*Id.* at 39:12-20.) Petitioner also testified that J.O. played with a classmate who is the daughter of Jose Arce, a convicted sex offender. (*Id.* at 36:01-04; Resp'ts' Hr'g Ex. 4, Ky. State Police Report.) J.O. played at her classmate's house, while the classmate's mother supervised the children. (Tr. at

4

40:03-08.) Petitioner testified that Arce was away at work when the children played in his house. (*Id.* at 40:09-15.)

Martha Patricia Cabrera Garcia ("Patricia"), Cabrera's sister and Oliveros's aunt, also lives in Las Palmas, Jalisco, a house away from Petitioner. (*Id.* at 42:02-05.) Patricia has known Petitioner since she was twelve years old and is her godmother. (*Id.* at 42:09-18.) Patricia testified that she was close to the Children when they lived in Mexico. (*Id.* at 43:08-10.) She testified that Petitioner did not take care of the Children. (*Id.* at 43:11-14.) Patricia explained that Petitioner would not return home from work when her shift ended. (*Id.* at 43:18-19.) She testified that when Petitioner was not home, Petitioner's mother or neighbors would take care of the Children, or J.O. would be left unsupervised playing in the street. (*Id.* at 43:20-44:05.) Patricia also took care of J.O. (*Id.* at 46:02-05.) She testified that J.O. would sometimes come to her house "really dirty," appearing as if she had not showered for two-to-three days. (*Id.* at 46:07-09.) Patricia testified that she bathed J.O. and removed lice from her hair. (*Id.* at 46:09-10, 51:14-16.) Patricia also washed J.O.'s clothes and bought her clothes and food. (*Id.* at 49:02-10.)

Patricia testified that J.O. would go to Arce's house to play with his daughter almost daily, and claimed to have seen J.O. and Arce together on several occasions. (*Id.* at 44:06-45:15, 49:20-24.) Patricia explained that she saw Arce put J.O. on his lap on three separate occasions. (*Id.* at 49:25-50:02.) Patricia testified that she relayed her concerns about J.O. spending time with Arce to Petitioner and Petitioner's mother, but they ignored her and continued to allow J.O. to play at his house. (*Id.* at 45:15-46:02.) Patricia further testified that Petitioner, Petitioner's parents, and the Children would take trips together with Arce to visit Petitioner's hometown two hours away. (*Id.* at 47:11-48:06.) Even though Patricia was concerned about J.O.'s safety, she

5

did not report her concerns about Arce to the Mexican authorities or social services. (*Id.* at 50:05-09.) Patricia also never reported her concerns about J.O.'s health to social services. (*Id.* at 50:25-51:02.) Patricia explained that there was not a social services organization in Las Palmas, and so she would have had to travel to Puerto Vallarta to report her concerns. (*Id.* at 51:17-25.)

During the time the Children lived in Mexico, Oliveros spoke with J.O. on the phone once a week. (*Id.* at 16:12-16, 84:01-04.) Oliveros knew that the Children were living with Petitioner at her parents' home, and that J.O. was enrolled in school. (*Id.* at 94:08-14.) Between September 2012 and February 2014, Oliveros never asked Petitioner for custody of the Children, nor did he ask her to send the Children back to Chicago. (*Id.* at 84:21-25, 85:12-14.) Oliveros testified, however, that before Petitioner left for Mexico, they had discussed and agreed to have the Children return to Chicago once they were old enough to attend school. (*Id.* at 85:01-11.)

In September 2013, Oliveros traveled to Las Palmas but he did not see the Children because they were not in town. (*Id.* at 16:07-09.) Oliveros testified that before he traveled to Mexico, he told Petitioner that he wanted to see the Children, and she replied that she would not let him see them if he came to Mexico with another woman. (*Id.* at 77:18-20.) Petitioner, on the other hand, testified that Cabrera sent her money and told her to leave town when Oliveros visited because she did not want the Children to meet Oliveros's new partner. (*Id.* at 38:04-16.)

Cabrera visited the Children in Mexico for the first time in December 2012. (*Id.* at 53:03-04.) She testified that during her first week-long visit, the Children appeared to be fine; she did not observe anything to indicate that Petitioner was neglecting the Children or otherwise parenting poorly. (*Id.* at 53:05-06, 67:08-14.) Cabrera's next trip to Mexico was in December 2013; she spent two weeks there. (*Id.* at 53:07-09, 55:23-24.) Every day during this second trip, Cabrera would pick up the Children and spend the day with them in Puerto Vallarta. (*Id.* at

53:16-24.) Cabrera testified that during this trip, she did not personally witness any mistreatment of the Children. (*Id.* at 54:04-06.) However, she testified that the neighbors told her that the Children were being neglected and were always in the street. (*Id.* at 53:11-12.) She also testified that she had a discussion with Petitioner's mother who told her that Petitioner was using the money Oliveros sent on herself instead of the Children, and that Petitioner was not taking care of the Children. (*Id.* at 54:12-19.) Cabrera said that Petitioner's mother agreed that Cabrera and Oliveros should take the Children to Chicago. (*Id.* at 55:20-22.)

Cabrera testified that during this trip, J.O. consistently told her that she wanted to go back to Chicago and live with her father. (*Id.* at 54:02-03.) J.O. told Cabrera that her maternal grandfather beat her "a lot," and that Petitioner and Petitioner's boyfriend also hit her. (*Id.* at 56:20-25.) Cabrera testified that J.O. told her about one specific occasion where her grandfather hit her. (*Id.* at 57:20-58:04.) On that occasion, J.O. was left alone with her grandfather, and walked in on him with another woman; he was "putting on his underwear" and the woman "was covered with a sheet." (*Id.* at 57:20-25.) J.O.'s grandfather hit her because she told her grandmother about what she had seen. (*Id.* at 58:01-04.) Cabrera also testified that J.O. told her that Petitioner, Petitioner's boyfriend, and a friend came home drunk one night and that J.O. had to sleep in the same bed as the friend. (*Id.* at 58:24-59:04.) However, Cabrera never personally witnessed Petitioner or Petitioner's father hit J.O. (*Id.* at 71:05-09.) Nevertheless, Cabrera testified that after hearing these stories from J.O. and speaking with the neighbors, she believed that J.O. was at risk of being hurt if she stayed in Mexico with Petitioner. (*Id.* at 58:20-22.)

Oliveros also testified that after he heard these stories from his mother, he started to develop concerns about Petitioner's parenting. (*Id.* at 89:15-24.) He further testified that he was concerned about the Children because he saw pictures of them on Facebook where they looked

dirty. (*Id.* at 90:02-08.) Oliveros testified, however, that he has no personal knowledge that Petitioner failed to bathe the Children. (*Id.* at 90:20-22.) He also testified that he has only witnessed Petitioner spank J.O. to discipline her. (*Id.* at 90:23-91:03, 95:20-23.) He explained that while they lived together in Chicago, Petitioner hit J.O. in the head a couple of times, and he told Petitioner that he did not like her hitting J.O.'s head; other than that, he never witnessed Petitioner hit J.O. in an inappropriate way. (*Id.* at 95:18-96:04.) Oliveros also testified that he has never seen Petitioner's father hit J.O. (*Id.* at 91:06-09.)

Cabrera's next trip to Mexico was in February 2014. (*Id.* at 58:08-09.) Oliveros also traveled to Mexico at that time. (*Id.* at 78:02-04.) During that trip, Cabrera asked Petitioner for permission to bring the Children back to Chicago for a month-long vacation. (*Id.* at 18:06-13, 67:22-68:04.) Petitioner agreed to allow the Children to spend one month in Chicago. (*Id.* at 18:10-24.) On February 17, 2014, Petitioner, Oliveros, and Cabrera went to a local notary public and had a document drafted to formalize their agreement. (*Id.* at 19:10-16, 86:24-87:03.) The document, signed by both Petitioner and Oliveros, stated that Cabrera had permission to take the Children to Chicago and that the Children would remain in Chicago from February 19, 2014, to March 23, 2014. (*Id.* at 19:22-20:19; Pet'r's Hr'g Ex. 4, Contract.) Petitioner testified that when she signed the agreement, she expected that the Children would return to Mexico on March 23, 2014; she did not agree to allow the Children to remain in the United States and live with Oliveros permanently. (Tr. at 20:20-22, 21:03-08.) Cabrera also testified that Petitioner told her that the Children could only stay in Chicago for that one month. (*Id.* 68:09-16.) Oliveros testified that when he signed the agreement, he did not intend to send the Children back after the month expired if he discovered that the rumors he had heard about Petitioner's treatment of the Children were true. (*Id.* at 87:03-14.) Oliveros further testified that when they signed the

8

agreement, Petitioner never told him that she did not want custody of the Children, nor did she tell him that the Children could live with him in Chicago permanently. (*Id.* at 87:15-21.) Cabrera purchased the airline tickets for the Children to travel to Chicago on February 19, 2014. (*Id.* at 19:23-25.)

Petitioner testified that during that month the Children were in Chicago, she spoke with the Children on the phone two-to-three times a week. (*Id.* at 21:09-14.) On March 23, 2014, when Petitioner was about to leave for the airport to pick up the Children, she received a phone call from Cabrera, who informed her that the Children would not be returning to Mexico that day. (*Id.* at 21:18-21.) Cabrera explained to Petitioner that J.O. started crying as soon as she started boarding the plane, and that a nurse and security officer approached Oliveros and told him that the Children could not fly with him until he proved that he was their father. (*Id.* at 21:25-22:05.) Petitioner testified that Cabrera told her that the Children would return to Mexico as soon as this issue was cleared up, which she indicated would probably be on the following Sunday. (*Id.* 22:06-10.) That following Sunday, Cabrera called Petitioner and told her that the Children were going to remain in Chicago until Oliveros could resolve the issue in court by proving that the Children lived with Petitioner in Mexico. (*Id.* at 22:11-23:01.) Petitioner testified that in the days that followed, she repeatedly called Cabrera to ask when the Children were going to be returned. (*Id.* at 23:05-07.) Then, on April 29, 2014, Cabrera called and told Petitioner that she did not want to lie to her anymore; Cabrera explained that the Children were not going to return to Mexico and that J.O. was already enrolled in school in Chicago. (*Id.* at 23:12-20.) Petitioner testified that she asked Cabrera to send the Children back to Mexico, and that she had not given Cabrera permission to enroll J.O. in school. (*Id.* at 23:20-24:02.) Petitioner testified that at some point, Cabrera stopped answering her phone calls, and so she

contacted Oliveros through e-mail on May 20, 2014, asking him to send the Children back to her. (*Id.* at 24:03-22; Pet'r's Hr'g Ex. 5, E-mail.) Oliveros responded to her e-mail, saying that he was not going to return the Children because Petitioner was a "bad mother." (Tr. at 25:07-12, 88:20-21.)

Cabrera testified to a different version of events. She explained that when J.O. arrived in Chicago, she appeared very nervous and would consistently tell Cabrera that she did not want to live with Petitioner. (*Id.* at 59:08-14.) Cabrera testified that she had intended to honor the contractual agreement and send the Children back to Mexico until J.O. began voicing her objections to returning. (*Id.* at 73:04-15.) Oliveros testified that he did not want to send the Children back because he believed they were being harmed in Mexico. (*Id.* at 93:01-16.) According to Cabrera, she called Petitioner in March and told her that the Children did not want to return to Mexico and that she was going to enroll J.O. in school in Chicago. (*Id.* at 59:18-20.) Cabrera told Petitioner that J.O. did not want to go back to Mexico because her grandfather and Petitioner's boyfriend would beat her. (*Id.* at 69:09-12.) Cabrera testified that even though Petitioner became upset, she agreed to the Children staying in Chicago and sent Cabrera J.O.'s school report so that J.O. could enroll in school in Chicago. (*Id.* at 59:22-60:14.) Cabrera explained that at first Petitioner asked her to send the Children back, but then agreed to let the Children stay because J.O. wanted to stay in Chicago. (*Id.* at 69:13-20.) Cabrera said that Petitioner called and spoke with J.O. after she was enrolled in school, and J.O. told Petitioner that she liked school. (*Id.* at 69:23-25.) Cabrera testified that in May 2014, Petitioner published an "ad" in the newspaper and on the radio in Puerto Vallarta claiming that Cabrera and Oliveros had kidnapped the Children. (*Id.* at 60:14-19.) Cabrera testified that when she discovered this information, she attempted to call Petitioner, but Petitioner hung up on her. (*Id.* 60:18-20.)

10

Cabrera testified that from that point on, Petitioner stopped calling to speak to Cabrera or the Children. (*Id.* at 61:07-10.)

Cabrera testified that shortly after enrolling in school, J.O. saw a psychologist once a week for about two months. (*Id.* at 62:23-63:03, 80:16-17.) Cabrera claimed that Petitioner knew that J.O. was seeing a psychologist. (*Id.* at 70:08-10.) J.O.'s grades when she started attending school in Chicago were B's and C's and D's. (*Id.* at 63:24-25; Resp'ts' Hr'g Ex. 5, Report Cards.) As the school year went on, however, J.O.'s grades improved to A's and B's. (Tr. at 64:03-05; Resp'ts' Hr'g Ex. 5, Report Cards.) Cabrera testified that J.O. is currently doing well in school, that she has started to read, and that she has made friends in school. (Tr. at 64:11-17.) Oliveros testified that when he saw J.O. in Mexico, she seemed different and appeared scared and shy, but now she is back to acting "like a normal child." (*Id.* at 78:20-21, 80:23-24.) Cabrera testified that the Children have many relatives in Chicago with whom they spend time and play. (*Id.* at 64:19-65:03.) The Children currently live with Cabrera and Oliveros in Cabrera's home. (*Id.* at 65:23-66:02.) Cabrera and Oliveros both testified that after Petitioner stopped calling, they did not send Petitioner any reports or updates about how the Children were doing. (*Id.* at 70:15-18, 89:05-10.) Oliveros claimed that when he e-mailed Petitioner, he told her that she could call him anytime to speak to the Children. (*Id.* at 89:13-14.)

Petitioner testified that as soon as she learned that Oliveros and Cabrera were not going to return the Children, she sought help at the Ministry of Foreign Relations and the "DIF Department." (*Id.* at 25:13-21, 26:14-17.) At the Ministry of Foreign Relations, she was directed to fill out a Hague Convention application. (*Id.* at 25:22-24.) Petitioner completed and sent in her first Hague Convention application in May 2014. (*Id.* at 26:01-04, 29:14-16.) Petitioner then filed a criminal complaint with the public prosecutor in Jalisco against Cabrera on

September 18, 2014. (*Id.* at 27:23-28:12; Pet'r's Hr'g Ex. 6, Criminal Compl.) Additionally, Petitioner requested and received a visa to travel to the United States. (Tr. at 26:25-27:04.) On September 19, 2014, Petitioner traveled to Los Angeles to seek help from family members. (*Id.* at 27:08-16.) Petitioner testified that while in Los Angeles, she learned that her Hague Convention application was incomplete, so she returned to Mexico to retrieve the missing documents and re-submit her application. (*Id.* at 29:18-24.) Petitioner explained that she did not travel to Chicago at that time to see the Children because she needed to complete her application as soon as possible. (*Id.* at 39:07-11.) Petitioner submitted a complete Hague Convention application in October 2014. (*Id.* at 30:01-02; Pet'r's Hr'g Ex. 8, Hague Convention Appl.) Petitioner subsequently filed her petition for the return of her minor children to Mexico (the "Petition") on March 20, 2015. (R. 1, Pet.)

## CONCLUSIONS OF LAW

The Hague Convention, a treaty to which both the United States and Mexico are signatories, was adopted to respond to the problem of international child abductions during domestic disputes. *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The drafters of the Convention's provisions sought to address the scenario in which one person, usually a parent, removes a child to or retains a child in a country that is not the child's habitual residence in order to "obtain a right of custody from the authorities of the country to which the child has been taken." Elisa Pérez-Vera, Explanatory Report, Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, ¶ 13 (1982) ("Pérez-Vera Report").[1]

---

[1] The Pérez-Vera Report is "recognized by the [Hague] Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." *Koch v. Koch*, 450 F.3d 703, 711 n.4 (7th Cir. 2006) (citation omitted). Many circuits treat the Pérez-Vera Report "as an

The Convention thus seeks "to ensure that the rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States" by securing the "prompt return of children wrongfully removed to or retained in any Contracting State." *Abbott*, 560 U.S. at 8 (quoting Hague Convention, art. 1).

Under the Convention, "a child abducted in violation of 'rights of custody' must be returned to the child's country of habitual residence, unless certain exceptions apply." *Id.* at 5 (citing Hague Convention, art. 1). Because the Convention seeks to return the parties to the pre-removal status quo, the Court must construe all of the defenses narrowly. *See* 42 U.S.C. § 11601(a)(4);[2] *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999) ("Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement—namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (*Friedrich I*))). Importantly, "[a]n action under the Convention and ICARA is not an action to determine the merits of custody rights." *Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006) (citation omitted). "The court's task is to simply determine which country is the proper forum for that custody determination." *Id.*; *see also Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) ("The court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." (citing 42 U.S.C. § 11601(b)(4))).

---

authoritative source for interpreting the Convention's provisions." *Id.* The Pérez-Vera Report is available at http://www.hcch.net/upload/expl28.pdf.

[2] ICARA was originally located at 42 U.S.C. § 11601 *et seq.* While it appears that ICARA was transferred to 22 U.S.C. § 9001 *et seq.*, courts in this Circuit and others continue to use the original citation. For the sake of clarity, this Court will also use the original citation throughout this opinion.

To prevail in her action for the return of the Children, Petitioner must establish by a preponderance of the evidence that the Children have been wrongfully removed or retained within the meaning of the Convention. 42 U.S.C. § 11603(e)(1)(A). If Petitioner meets this burden, the Children must be returned unless Respondents establish one the defenses provided for in the Convention. *See* Hague Convention, art. 12, 13, 20; 42 U.S.C. § 11603(e)(2)(A)-(B). The Court first addresses whether Petitioner has established a case of wrongful retention,[3] and then turns to the defenses asserted by Respondents.

## I.    Wrongful Retention

Under the Convention, there are three main elements that a petitioner must prove to establish the wrongful removal or retention of a child. First, for the Convention to apply, the child must have been a "habitual resident" in the country from which she was removed "immediately before any breach of custody or access rights." Hague Convention, art. 4. Second, the removal or retention must have been "in breach of rights of custody attributed to a person . . . under the laws of the State in which the child was habitually present immediately before the removal or retention[.]" *Id.*, art. 3(a). Finally, "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.*, art. 3(b); *see also Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007)

---

[3] Technically, because Petitioner agreed to allow the Children to temporarily visit the United States, this is a case of wrongful retention rather than wrongful removal. The removal of the Children from Mexico was not wrongful or in violation of Petitioner's custody rights because she consented. Because wrongful removal and wrongful retention are treated identically under Article 3 of the Convention and much of the literature, and because the parties to this suit use both "removal" and "retention" throughout their briefs, the Court will use these terms interchangeably. Under the Convention, a determination that a retention is wrongful has the same consequences as a determination of a wrongful removal—mandatory return of the child, unless one of the exceptions apply. Pérez-Vera Report at ¶ 12 ("Naturally, a refusal to restore a child to its own environment after a stay abroad to which the person exercising the right of custody had consented must be put in the same category [as a removal of a child from her habitual environment].").

("A petitioner can establish that the removal of a child is 'wrongful' where: (1) the child was 'habitually resident' in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of the removal." (citation omitted)).

Petitioner first argues that she has established by a preponderance of the evidence that the Children were habitual residents of Mexico immediately prior to the wrongful retention. (R. 29, Pet'r's Br. at 3-5.) While Respondents initially denied that the Children were habitual residents of Mexico in their response to the Petition, (R. 22, Resp'ts' Resp. ¶ 16), they did not provide any evidence or arguments that the Children were not habitual residents of Mexico either in the evidentiary hearing or in their post-hearing response brief.

The Hague Convention does not define habitual residence. *Redmond v. Redmond*, 724 F.3d 729, 742 (7th Cir. 2013). The Seventh Circuit has held that "[t]he determination of habitual residence under the Hague Convention is a practical, flexible, factual inquiry that accounts for all available relevant evidence and considers the individual circumstances of each case." *Id.* at 732. "Determining a child's habitual residence thus requires an assessment of the observable facts on the ground, not an inquiry into the child's or parent's legal status in a particular place." *Id.* at 743. In determining habitual residence, a court should consider both the "shared intent of the parents" and the child's "acclimatization" in a country. *Id.* at 746 (explaining that all circuits essentially "consider *both* parental intent *and* the child's acclimatization, differing only in their emphasis," and refusing "to set in stone the relative weights" of each factor); *Koch*, 450 F.3d at 715 (explaining that habitual residence may be established by the shared actions and intent of the parents, coupled with "the passage of an appreciable amount of time"). "In determining the

parents' intent, the court should look at actions as well as declarations." *Koch*, 450 F.3d at 715 (citing *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005)).

In this case, the evidence demonstrates that prior to the wrongful retention, Petitioner and Oliveros had a shared intent that the Children would live in Mexico. Regardless of whose version of events is true, it is undisputed that Oliveros did not object when Petitioner took the Children to Mexico in September 2012; indeed, he paid for their plane tickets. (Tr. at 12:09-11, 83:07-15.) Nor did Oliveros object in December 2012 to Petitioner and the Children staying in Mexico. (*Id.* at 13:11-15.) From September 2012 to February 2014, Oliveros never asked Petitioner for custody or that she return the Children to Chicago. (*Id.* at 84:21-25, 85:12-14.) In fact, during this time period, he sent money to Petitioner in Mexico to help her care for the Children. (*Id.* at 13:22-25, 76:12-14.)

Oliveros testified that it was always his and Petitioner's intent to send the Children back to Chicago to attend school. (*Id.* at 85:01-11.) Thus, even though Oliveros offered no legal arguments on this issue, his position appears to be that he never intended for the Children to abandon their habitual residency in the United States for Mexico. However, the Seventh Circuit has explained that in cases where one parent "consented to let the child stay abroad for some period of ambiguous duration" and "the circumstances surrounding the child's stay . . . suggest that, despite the lack of perfect consensus, the parents intended the stay to be indefinite," courts may find that the child's prior country of habitual residence has been abandoned for their new country of habitual residence. *Koch*, 450 F.3d at 713 (citing *Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir. 2001)). Here, Oliveros consented to the Children living in Mexico for an indefinite time, as there was no agreed upon return date. Thus, while the United States may have been the Children's prior country of habitual residence, and there may have been a shared intent

for the Children to return to Chicago at some point to attend school, this does not prevent a finding that their habitual residence in the United States has been abandoned for Mexico. *See Koch*, 450 F.3d at 717 ("[A]fter some period of time in the new environment, the habitual residence of the children will change regardless of the parents' hopes to someday return to the prior residence."); *see also Silverman v. Silverman*, 338 F.3d 886, 898 (8th Cir. 2003) (explaining that habitual residence must encompass some form of settled purpose but the "settled purpose need not be to stay in the new location forever"; rather "the family must have a 'sufficient degree of continuity to be properly described as settled.'" (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 223 (3rd Cir. 1995))).

Additionally, the evidence demonstrates that the Children had acclimatized to their lives in Mexico. During the 17 months the Children lived in Mexico, they lived with Petitioner in their maternal grandparents' house and had frequent contact with extended family members. (Tr. at 12:06-08, 13:19-21, 31:05-09.) J.O. attended preschool and M.O. attended daycare. (*Id.* at 14:12-17, 15:19-23.) J.O. also attended dance classes and was involved in religious education. (*Id.* at 31:19-32:04.) She had friends at school and also had friends in the neighborhood. (*Id.* at 32:08-15.) All these facts demonstrate that the Children had adjusted to and settled into their community in Mexico. *See Redmond*, 724 F.3d at 743 (finding that there was sufficient evidence of child's acclimatization in Illinois where child had frequent contact with his extended family, went to daycare, pre-school, and church, had neighborhood friends, and played on a baseball team); *Feder*, 63 F.3d at 224 (finding that Australia was a four-year-old child's habitual residence because for six months he "attended preschool and was enrolled in kindergarten for the upcoming year, participating in one of the most central activities in a child's life"). The Court

therefore finds that the Children were habitual residents of Mexico immediately prior to their retention in Chicago.

Petitioner next contends that she has custody rights pursuant to Mexican law, and that those rights were violated by Respondents' retention of the Children. (R. 29, Pet'r's Br. at 5-6.) Respondents do not provide any evidence or arguments to counter Petitioner's contention. To establish the second element of wrongful retention under the Convention, Petitioner must prove that she has "rights of custody" over the Children under Mexican law and that the retention of the Children breached those rights. Hague Convention, art. 3. The Convention states that "[t]he rights of custody . . . may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *Id.* Rights of custody "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence[.]" *Id.*, art. 5(a).

The applicable law here is the Civil Code for the State of Jalisco, Mexico (the "Civil Code").[4] In Mexico generally, and in Jalisco particularly, custody law is based on the doctrine of *patria potestas* (parental authority/responsibility), which governs the relationship between parents and their children. *Seaman v. Peterson*, 762 F. Supp. 2d 1363, 1378 (M.D. Ga. 2011). *Patria potestas* "can be understood as the series of reciprocal rights and obligations that exists between the father and the mother . . . and the non-emancipated minor children. Its purpose is

---

[4] Article 14 of the Convention allows a court, "[i]n ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, . . . [to] take notice directly of the law of . . . the State of the habitual residence of the child, without recourse to the specific procedures for proof of that law . . . which would otherwise be applicable." Hague Convention, art. 14. Additionally, under ICARA, no authentication of documents or information included with a petition under the Convention "shall be required in order for the . . . document[ ] or information to be admissible in court." 42 U.S.C. § 11605. To that end, the Court takes judicial notice of the translated excerpts of the Civil Code for the State of Jalisco, Mexico, provided by Petitioner. (*See* Pet'r's Hr'g Ex. 9, Civil Code.)

the custody of the minors themselves as well as their assets and it is intended to protect them." Civil Code, art. 578. *Patria potestas* "represents a positive duty of constant care" and "confers the right and duty to discipline in a prudent and moderate manner, with the purpose of harmonic and positive education." *Id.*, art. 580; *see also Whallon v. Lynn*, 230 F.3d 450, 458 (1st Cir. 2000) (concluding that the rights conferred on a parent by *patria potestas* are "rights of custody" as defined under the Convention). *Patria potestas* is exerted by both parents, and lasts until it ceases under Article 597,[5] is terminated under Article 598,[6] or is suspended under Article 601.[7] Civil Code, art. 581, 597-98, 601. Petitioner thus has rights of custody over the Children pursuant to Article 581 of the Civil Code, and there is no evidence that those rights have ceased, have terminated, or have been suspended. Petitioner's rights were therefore violated when Respondents retained the Children in Chicago past the documented agreed-upon return date.

Finally, Petitioner argues that she was exercising those custody rights at the time of the Children's retention. (R. 29, Pet'r's Br. at 6.) Respondents do not provide any evidence or arguments in response to Petitioner's assertion. To satisfy the final element of wrongful retention, Petitioner must prove that she was actually exercising her custody rights at the time the

---

[5] Article 597 provides that *patria potestas* ceases: "I. By death of the person who exerts it if there is no other person to whom it corresponds; II. By emancipation of the minor; III. When the child reaches the age in which he or she is no longer legally a minor; IV. By the revocation of a simple adoption." Civil Code, art. 597.

[6] Article 598 provides that *patria potestas* can be terminated when the person exerting *patria potestas*: (1) commits an intentional criminal offense that affects the minor; (2) is expressly condemned to its loss; (3) jeopardizes the physical or psychological health, safety of the minor; (4) exposes the child; abandons the child for longer than three months if he or she was placed under the care of a specialized institution or another person; and abandons the child for longer than a day if the minor was not put under the care of anybody and if the abandonment is intentional. Civil Code, art. 598.

[7] Article 601 provides that *patria potestas* can be suspended: "I. Due to a judicially pronounced lack of capacity; II. Due to judicially pronounced absence; III. Due to a guilty verdict that imposes the suspension as part of the sentence." Civil Code, art. 601.

Children were retained, or would have been but for the retention. Hague Convention, art. 3(b). Although the Convention does not define "exercise of custody rights," case law indicates that "a petitioner's burden under Article 3(b) is minimal." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009). Once a petitioner has established that she has custody rights under the laws of the country of habitual residence, courts "liberally" find the exercise of those custody rights. *Bader*, 484 F.3d at 671 (citation omitted); *see also Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012). Essentially, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996) (*Friedrich II*). In this case, Petitioner was living with and caring for the Children in Mexico. (Tr. at 12:06-08, 13:19-21.) Further, Petitioner only agreed to allow the Children to visit Chicago for one month, during which she kept in regular contact with them. (*Id.* at 20:20-22, 21:03-14.) She did not agree to allow the Children to live in Chicago permanently, nor did she surrender custody of the Children to Respondents. (*Id.* at 87:15-21.) Thus, the evidence clearly demonstrates that Petitioner was exercising her custody rights at the time of the Children's retention in Chicago.

Accordingly, the Court finds that Petitioner has met her initial burden of establishing a prima facie case of wrongful retention under the Hague Convention. The Court now turns to the affirmative defenses asserted by Respondents.

## II.  Affirmative Defenses

Under the Hague Convention, the Court must return the Children to Mexico unless Respondents can establish one of the exceptions provided for in the Convention. 42 U.S.C. § 11601(a)(4). The Court must construe all the defenses narrowly to effectuate the purposes of the

Convention, and even where a defense applies, the Court has discretion to order the Children's return. *Id.*; *Walker*, 701 F.3d at 1123. Respondents assert four defenses: (1) the "consent or acquiescence" exception; (2) the "grave risk" exception; (3) the "age and maturity" exception; and (4) the "public policy" exception. (R. 30, Resp'ts' Br. at 3-9.) The Court addresses each defense in turn.

### A.     The "consent or acquiescence" exception

The first affirmative defense asserted by Respondents is that Petitioner acquiesced to the Children's retention in the United States. (R. 30, Resp'ts' Br. at 3-4.) Petitioner argues that Respondents have failed to meet their burden of proving this defense because the evidence shows that she never formally agreed to or accepted the Children's retention in Chicago. (R. 29, Pet'r's Br. at 6-8.)

Under Article 13(a) of the Convention, the Court is not bound to order the return of the Children if Respondents establish by a preponderance of the evidence that Petitioner "had consented to or subsequently acquiesced in the removal or retention[.]" Hague Convention, art. 13(a); *see also* 42 U.S.C. § 11603(e)(2)(B). "Consent and acquiescence are analytically distinct defenses to return under the Convention." *Walker*, 701 F.3d at 1122 (citing *Baxter v. Baxter*, 423 F.3d 363, 371 (3rd Cir. 2005)). "The consent exception applies when a petitioning parent, either expressly or through his conduct, agrees to a removal or retention before it takes place." *Id.* (citing *Baxter*, 423 F.3d at 371). The acquiescence exception "is implicated if a petitioning parent agrees to or accepts a removal or retention after the fact." *Id.* (citing *Baxter*, 423 F.3d at 371). The defense of acquiescence has been held to require either "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II*,

78 F.3d at 1070 (internal footnotes omitted); *see also Walker*, 701 F.3d at 1122. Further, "the acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced." *Baxter*, 423 F.3d at 371.

Respondents appear to be arguing that because Petitioner allowed the Children to travel to the United States, and because she knew where they were living in Chicago, she consented to their removal and retention. (R. 30, Resp'ts' Br. at 3-4.) In support of this argument, Respondents contend that the agreement signed by Petitioner and Oliveros "was a document authorizing the Children to travel with their grandmother and was not an implicit agreement for the trip to be of a certain amount of time." (*Id.* at 3.) However, the agreement explicitly states that the Children will remain in Chicago only from February 19, 2014, to March 23, 2014. (Pet'r's Hr'g Ex. 4, Contract.) Petitioner testified that when she signed the agreement, she intended to only allow the Children to stay in Chicago for that one month, and Oliveros and Cabrera both testified that they understood this to be Petitioner's intent. (Tr. at 20:20-22, 68:09-16, 87:15-21.) Thus, Petitioner consented to the Children traveling to and remaining in Chicago for one month, but she clearly did not consent to the Children's retention in Chicago for longer than that month. *See Baxter*, 423 F.3d at 371 ("The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention."); *Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 871 (N.D. Ill. 2001) ("Many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return.").

As to acquiescence, Respondents have provided no evidence to prove that Petitioner formally agreed to or accepted the retention of the Children in Chicago after the one month

expired. Thus, to successfully assert this defense, Respondents must prove that Petitioner demonstrated a "consistent attitude of acquiescence over a significant period of time." *Friedrich II*, 78 F.3d at 1070. Respondents argue that Petitioner acquiesced to the retention of the Children because she provided Cabrera with J.O.'s school documents so that J.O. could attend school in Chicago, did not contact the Children for months, and traveled to Los Angeles instead of Chicago when she received a visa to travel to the United States. (R. 30, Resp'ts' Br. at 3-4.) First, Petitioner denies giving Cabrera permission to enroll J.O. in school. (Tr. at 23:20-24:02.) Petitioner claims that she only sent Cabrera J.O.'s school records because Cabrera told her that Oliveros needed to prove to a court that J.O. lived in Mexico before they could return the Children. (R. 32, Pet'r's Reply at 2.) Second, Cabrera testified that Petitioner stopped calling her and the Children sometime in May 2014 after she accused Cabrera of kidnapping in the Puerto Vallarta newspaper. (Tr. at 60:14-17, 61:07-10.) Thus, Petitioner stopped calling the Children after she had already started taking steps to get the Children back. Third, Petitioner explained that she traveled to Los Angeles to seek help from family who lived there, and after a brief stay, she had to return to Mexico to complete her Hague Convention application. (*Id.* at 27:08-16, 29:18-24.) The Court therefore finds that Respondents have not presented sufficient evidence to demonstrate that Petitioner had a consistent attitude of acquiescence.

In fact, the evidence overwhelmingly demonstrates that Petitioner's subjective intent was to get the Children back. Petitioner testified that beginning on March 23, 2014, the date the Children were scheduled to return to Mexico, she repeatedly asked Respondents to send the Children back. (*Id.* at 23:05-07.) On May 21, 2014, Petitioner sent Oliveros an e-mail imploring him to return the Children. (*Id.* at 24:03-22; Pet'r's Hr'g Ex. 5, E-mail.) Petitioner testified that as soon as she realized that Respondents were not going to return the Children, she began taking

steps to get them back. (Tr. at 25:13-21.) In May 2014, she sought help at the Ministry of

Foreign Relations and at the "DIF Department" in Mexico; these agencies helped her fill out a

Hague Convention application. (*Id.* at 25:13-24, 26:14-20.) In September 2014, she filed a

criminal complaint with the public prosecutor in Jalisco against Cabrera. (*Id.* at 27:23-28:12;

Pet'r's Hr'g Ex. 6, Criminal Compl.) Also in September, Petitioner traveled to Los Angeles to

seek help from family. (Tr. at 27:08-16.) Then, in October 2014, Petitioner submitted her

completed Hague Convention application. (*Id.* at 30:01-02; Pet'r's Hr'g Ex. 8, Hague

Convention Appl.) All of Petitioner's actions demonstrate that she objected to the Children's

retention in Chicago and diligently acted to secure their return to Mexico. *See Baxter*, 423 F.3d

at 372 (finding that father had not consented to or acquiesced in the child's retention where he

had only agreed to allow the child to visit the United States for a few months and "vigorously

objected and pursued his rights under the Convention" as soon as he learned of the mother's

decision to retain the child).

Accordingly, the Court finds that Respondents have failed to prove by a preponderance of

the evidence that Petitioner consented to or acquiesced in the retention of the Children in

Chicago.

**B.     The "grave risk" exception**

Respondents' second affirmative defense is that there is a grave risk that the Children's

return to Mexico would expose them to physical or psychological harm. (R. 30, Resp'ts' Br. at

4-6.) Petitioner argues that Respondents have failed to meet their burden of proving that

returning the Children to Mexico would pose a grave risk of harm. (R. 29, Pe't'r's Br. at 8-10.)

Under Article 13(b) of the Convention, the Court is not bound to order the return of the

Children if Respondents establish by clear and convincing evidence that "there is a grave risk

24

that [their] return would expose [them] to physical or psychological harm or otherwise place [them] in an intolerable situation." Hague Convention, art. 13(b); *see also* 42 U.S.C. § 11603(e)(2)(A). The Seventh Circuit has emphasized that the risk must "truly be grave" to justify declining to return the child to her habitual residence. *Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2001) (citation omitted); *see also* Hague Int'l Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (Dep't of State Mar. 26, 1986) ("Dep't of State Legal Analysis") ("The person opposing the child's return must show that the risk to the child is grave, not merely serious."). The Second Circuit has characterized the grave risk exception as follows:

> [A]t one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001). In a frequently-cited opinion, the Sixth Circuit explained that a grave risk exists in only two situations: (1) where returning the child means sending her "to a zone of war, famine, or disease"; or (2) "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Friedrich II*, 78 F.3d at 1069. To succeed in asserting this defense, Petitioner must put forth "specific evidence of potential harm to the [Children] upon [their] return." *Baxter*, 423 F.3d at 374.

Respondents argue that Arce, a convicted sex offender, poses a grave risk to J.O. if she is returned to Mexico. (R. 30, Resp'ts' Br. at 5-6.) Specifically, Respondents contend that Arce "is a convicted sex offender of a young victim and his presence around J.O. is a great risk to her and

puts her in an intolerable situation of potentially becoming a victim of his sexual abuse." (*Id.*)

"Sexual abuse most certainly constitutes a 'grave risk' of physical or psychological harm. Similarly, sexual abuse, particularly by a custodial parent, is a well-recognized example of an 'intolerable situation' within the meaning of this exception." *Ortiz v. Martinez*, No. 14-2048, --- F.3d---, 2015 WL 3650649, at *6 (7th Cir. June 15, 2015). However, Respondents have not provided any evidence that suggests, nor are they actually asserting, that Arce has sexually abused J.O. Rather, Patricia testified that J.O. played at Arce's house with his daughter almost daily, and claimed to have seen J.O. and Arce together on several occasions. (Tr. at 44:06-45:15, 49:20-24.) She further testified that she saw Arce put J.O. on his lap on three separate occasions. (*Id.* at 49:25-50:02.) Respondents are therefore concerned that Arce may sexually assault J.O. in the future if Petitioner continues to allow J.O. to spend time with him. (R. 30, Resp'ts' Br. at 5-6.) Recognizing that "the probability of recidivism in Mr. Arce is difficult to determine," Respondents cite to a study published by the U.S. Department of Justice, Bureau of Justice Statistics, which found a sexual recidivism rate of 5.3 percent for a sample of 9,691 male sex offenders released from prisons in 1994 during a three-year follow up period. (*Id.* at 5 (citing Roger Przybylski, Sex Offender Assessment and Planning Initiative, Chapter 5: Adult Sex Offender Recidivism (October 2014), available at http://www.smart.gov/SOMAPI/sec1/ch5_recidivism.html).) While this study is informative, it does not assist the Court in determining the risk Arce poses to J.O. Respondents have presented no specific evidence that suggests that Arce may sexually assault J.O. in the future. Without this evidence, the Court cannot find that the risk of harm to J.O. is grave. *Cf. Ortiz*, 2015 WL 3650649, at *6 (invoking the grave risk exception because "the evidence of sexual abuse was

substantial" where the mother's detailed testimony about how she had seen the father molest the child in the shower was consistent with the child's description of events).[8]

Additionally, although Respondents do not assert this argument in their post-hearing brief, they argued in their initial response to the Petition that J.O. would be at grave risk of physical and psychological harm if she returned to Mexico because Petitioner, her maternal grandfather, and Petitioner's boyfriend physically abuse her. (R. 22, Resp'ts' Resp. at 8.) The Seventh Circuit has made clear that "[i]f handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over[.]" *Van De Sande v. Van De Sande*, 431 F.3d 567, 571 (7th Cir. 2005). To establish the grave risk defense on this basis, there must be evidence that the child will be exposed to frequent and serious domestic abuse. *See Van de Sande v. Van de Sande*, No. 05 CV 1182, 2008 WL 239150, at *10-*11 (N.D. Ill. Jan. 29, 2008) (on remand from the Seventh Circuit, finding that mother established "grave risk" defense where she presented affidavits of four witnesses that painted "a consistent and disturbing picture" of serious physical and verbal abuse, father threatened to kill the children in the presence of witnesses, instances of abuse were reported to the police, and the court had no reason to question the mother's version of events); *see also Baran v. Beaty*, 526 F.3d 1340, 1352 (11th Cir. 2008) (affirming district court's finding of grave risk due to the credible evidence that

---

[8] The Court appointed a guardian *ad litem* to represent the Children during these proceedings. (R. 23, Order.) The guardian *ad litem* submitted a post-hearing brief on August 7, 2015, arguing that the Children should remain in Chicago with Respondents. (R. 34, Guardian ad Litem's Br. at 1.) The guardian *ad litem* contends that there is a grave risk of harm to J.O. if she is returned to Mexico because Petitioner allows J.O. to frequently visit and play at Arce's house. (*Id.* at 2-4.) However, the guardian *ad litem* offers no additional evidence or case law to support this argument beyond what the Court has already considered. As explained above, the fact that Arce is a convicted sex offender is not sufficient evidence that J.O. faces a grace risk of harm if she is returned.

27

the father was "a violent and abusive man with a lengthy history of inflicting physical and psychological abuse on those he ostensibly loves the most"); *Di Giuseppe v. Di Giuseppe*, No. 07-CV-15240, 2008 WL 1743079, at *6 (E.D. Mich. Apr. 11, 2008) (finding a grave risk where the mother used corporal punishment three times a month, including slapping the child hard enough to leave marks, slamming the child's head into a cupboard, which drew blood, and biting the child in front of school officials).

In this case, Petitioner testified that she and her father spanked J.O. only to discipline her. (Tr. at 34:16-25.) Oliveros testified that while they were living together, he witnessed Petitioner spank J.O. and hit J.O. on the head a couple of times, but only to discipline her. (*Id.* at 90:23-91:03, 95:18-96:04.) He also testified that he has never witnessed J.O.'s maternal grandfather hit her. (*Id.* at 91:06-09.) Cabrera testified that she never personally witnessed either Petitioner or J.O.'s maternal grandfather hit J.O., but J.O. told her that they do. (*Id.* at 56:20-25, 71:05-09.) There is no evidence that Petitioner, her father, or her boyfriend ever hit J.O. inappropriately. No witnesses testified to any physical contact beyond traditional disciplinary measures, and there are no police reports or medical reports documenting any physical abuse. Respondents have thus failed to prove that there is "some nonnegligible probability" that Petitioner or her father will injure J.O. if she is returned to Mexico.[9] *See Van De Sande*, 431 F.3d at 571; *see also Altamiranda Vale v. Avila*, 538 F.3d 581, 587 (7th Cir. 2008) (holding that grave risk was not shown where the father may have "once struck his son with a video-game cord"); *Estrada v. Salas-Perez*, No. 12 C 1016, 2012 WL 4503147, at *11 (N.D. Ill. Sept. 28, 2012) (finding that

---

[9] Respondents presented no evidence at the evidentiary hearing, and they are not arguing, that Petitioner or Petitioner's father physically abuse M.O. In her *in camera* interview—which will be discussed in greater detail below—J.O. informed the Court that her grandfather also hit her brother. This testimony alone, however, is not sufficient evidence to prove that there is a grave risk that M.O. will be harmed if he is returned to Mexico.

the evidence showed "that there were a handful of physical episodes during the two years" that the child lived with his father and stepmother, and "that the 'rare and unusual' physical episodes—which in addition to being rare and unusual were not terribly severe when compared by the episodes described in reported Hague Convention cases—do not create a serious risk of physical or psychological harm, let alone a grave risk of such harm"); *Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1261-62 (M.D. Fla. 2008) (son indicated that his father hit him twice and daughter told a doctor that her father had hit her once or twice, but court found that even if it "took all of the children's testimony as true, it does not rise to the level of an intolerable situation" because "[t]his evidence only indicates that [the father] has used corporal punishment to discipline the children in the past" and "there is no objective evidence of serious abuse by [the father]").

Finally, during the evidentiary hearing, Respondents suggested that Petitioner poses a grave risk of harm to the Children because she neglects them and is a "bad mom." (Tr. at 89:15-19; 53:11-12.) Specifically, Patricia testified that J.O. was frequently left unsupervised in the street, had lice, and was often dirty. (*Id.* at 43:22-25, 46:07-09, 49:11-24, 51:14-16.) Cabrera testified that Petitioner's mother informed her that Petitioner was using the money Oliveros sent on herself instead of the Children, and that the neighbors told her that the Children were being neglected. (*Id.* at 53:11-12, 54:12-19.) Oliveros testified that while he had no personal knowledge that Petitioner failed to bathe the Children, he saw pictures of them on Facebook where they looked dirty, and this caused concern. (*Id.* at 90:02-08, 90:20-22.) However, Oliveros also testified that while they lived together in Chicago, Petitioner was a good mother and he trusted her to stay home and take care of the Children. (*Id.* at 82:10-24, 95:07-09.) The evidence presented by Respondents falls far short of proving that the Children will face a serious,

let alone grave, risk of harm if they are returned to Petitioner. It is important to note that "[i]t is not relevant to [the grave risk] exception who is the better parent in the long run[.]" *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995). "The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Friedrich II*, 78 F.3d at 1068; *see also* Dep't of State Legal Analysis, 51 Fed. Reg. at 10510 (Article 13(b) is "not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests."). Pursuant to the Convention, those custody issues are expressly reserved for the courts in Mexico. The Convention, as well as this Court, presumes that the courts in Mexico will fully protect the best interests of the Children.

Accordingly, the Court finds that Respondents have failed to meet their burden in asserting the grave risk defense.

## C.     The "age and maturity" exception

Respondents' next affirmative defense is that J.O. objects to being returned and that she has reached an age and degree of maturity where it is appropriate to take account her views. (R. 30, Resp'ts' Br. at 6.) Under Article 13 of the Convention, the Court "may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. Respondents must establish J.O.'s maturity by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). In support of this defense, Respondents presented testimony that J.O. is doing well in school and that she is starting to read. (Tr. at 64:03-05, 64:11-17; Resp'ts' Hr'g Ex. 5, Report Cards.) Oliveros further testified that J.O. is no longer shy and acts like a "normal" child. (Tr. at 78:20-21, 80:23-24.) Respondents understand, however, that the age and

maturity defense will ultimately be based on the Court's *in camera* interview with J.O.[10] (R. 30, Resp'ts' Br. at 6.)

"The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis." *Yang v. Tsui*, 499 F.3d 259, 279 (3rd Cir. 2007). "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *Simcox v. Simcox*, 511 F.3d 594, 604 (7th Cir. 2007) (quoting *De Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007)) (affirming district court's finding that eight-year-old boy was not of sufficient age and maturity because during his *in camera* interview he was "preoccupied, disinterested and detached; in short, a typical eight year old boy who strongly desired to be anywhere but in a Judge's chambers answering questions"); *see also Yang*, 499 F.3d at 279 (affirming the district court's finding that "despite her intelligence and demeanor," a ten-year-old girl did not have sufficient age or maturity for her views to be considered); *Anderson v. Acree*, 250 F. Supp. 2d 876, 883-84 (S.D. Ohio 2002) (finding that an eight-year-old girl was "of sufficient age and maturity" to have her views considered because, in an *in camera* interview, she could point to her native country on a globe, appeared to understand the judge's questions, and "indicated her understanding of the difference between truth and falsehood and of her obligation to tell the truth"). "As with any of the affirmative defenses under the Convention, this defense is to be construed narrowly." *Yang*, 499 F.3d at 278. Additionally, "a 'court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis,' such as whether the

---

[10] Respondents concede that M.O., who is three years old, is not of sufficient age and maturity to make a decision as to where he wants to live. (R. 30, Resp'ts' Br. at 6.) Respondents wish for the children to remain together. (*Id.*) Thus, Respondents request that M.O. be kept with J.O. in the event that any exception applies to J.O. (*Id.*)

child would suffer a grave risk of harm if returned to his or her habitual residence." *Id.* (quoting *De Silva*, 481 F.3d at 1286). Further, a child's expression of a generalized preference to remain in one country, without more particularized objections to being returned, are generally insufficient to invoke the application of this exception. *See Yang*, 499 F.3d at 279 (ten-year-old girl's affinity for her school, her preference for living in a house rather than a small apartment, and having friends and brothers was not sufficient for the court to invoke the "wishes of the child" exception under Article 13); *Locicero v. Lurashi*, 321 F. Supp. 2d 295, 298 (D.P.R. 2004) ("The fact that the [13-year-old] child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sport activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return.").

As indicated above, the Court conducted an *in camera* interview with J.O. on June 11, 2015. The Court conducted the interview primarily in Spanish with the assistance of a translator because J.O. informed the Court that she knows more Spanish than English. J.O. understood why she was talking to the Court, and understood the Court's questions. She answered all of the questions, often nodding in response or providing short answers. J.O. told the Court that she is seven years old and in first grade. She said that she likes school, and that she has friends. When asked about her feelings about living in Mexico, J.O. responded that her grandfather hit her a lot and that she did not get bathed often. J.O. also said that her mother "wouldn't take [her] anywhere" in Mexico. J.O. told the Court that neither her father nor her paternal grandparents hit her, and that she likes her paternal grandmother more than her maternal grandmother because "she takes [her] places, she gives [her] things, and she bought [her] a bicycle" for her birthday.

It is clear to the Court that J.O. prefers to live with her father and grandmother in Chicago because she perceives that she is treated better, taken to more places, and receives gifts.

The Court does not wish to discredit J.O.'s desires, however, the Court finds that J.O. is not of sufficient age and maturity to meet the strict standard for invoking this exception. *See Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 598 (D.S.C. 2013) (finding that a nine-year-old boy and ten-year-old boy were not of sufficient age and maturity because while they were "polite, smart boys," they did not seem "to be especially sophisticated or to have reached a maturity beyond their years"); *Rivas v. Segovia*, No. 2:10-CV-02098, 2010 WL 5394778, at *6 (W.D. Ark. Dec. 28, 2010) (finding that a seven-year-old girl was "not of sufficient age and maturity to warrant the application of the exception"); *Lopez*, 547 F. Supp. 2d at 1259 (same). Additionally, the Court is concerned that J.O. may be unduly and unintentionally influenced, like any normal seven-year-old child, by the gifts she has received from her father's family.

Accordingly, Respondents' assertion of the age and maturity defense fails and the Court will not refuse to return the Children to Mexico on the basis of J.O.'s objections.

### D. The "public policy" exception

Finally, for the first time in their post-hearing brief, Respondents attempt to assert the exception provided for in Article 20 of the Convention. Article 20 states that "[t]he return of the child . . . may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20. Respondents have the burden of proving this exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). This defense is meant to be "restrictively interpreted and applied . . . on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Hazbun Escaf v. Rodriquez*, 200 F.

Supp. 2d 603, 614 (E.D. Va. 2002) (quoting Dep't of State Legal Analysis, 51 Fed. Reg. at 10510); *see also Aldinger v. Segler*, 263 F. Supp. 2d 284, 290 (D.P.R. 2003) (Article 20 "is directed to concerns about harms arising from the child's return to a particular country. Article 20 envisioned a limited situation where human rights concerns, most likely defined within the parameters of other international agreements, would prohibit return." (citation omitted)).

In this case, Respondents cursorily argue that Article 20 applies because "social conditions in Mexico are abysmal in comparison to the United States and violence and corruption relating to drug trafficking and gangs is rampant." (R. 30, Resp'ts' Br. at 6.) Respondents contend that "Mexican laws do not adequately protect women and girls from domestic violence and sexual violence." (*Id.* at 7 (quoting Human Rights Watch, World Report 2013: Mex., https://www.hrw.org/world-report/2013/country-chapters/mexico).) Respondents also assert that "[t]here are high rates of violent and non-violent crime throughout the Guadalajara district of which Jalisco is a part." (*Id.* (citing U.S. Dep't of State, Bureau of Diplomatic Security, Mex. 2014 Crime and Safety Report: Guadalajara, https://www.osac.gov/pages/contentreportdetails.aspx?cid=15620).) Respondents are essentially asking the Court to use Article 20 to pass judgment on the social and political system of Mexico. However, the Article 20 exception is not to be used "as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed." Dep't of State Legal Analysis, 51 Fed. Reg. at 10510. The evidence presented by Respondents regarding Mexico's high crime rate and the legal system's inadequacies at protecting women from domestic violence does not meet the "shocks the conscience" standard required under Article 20. This is especially true in light of this city's own unfortunate high crime rate. *See* Crime in Chicagoland, Chicago Tribune, http://crime.chicagotribune.com. In

fact, Respondents have not provided, and the Court was unable to find, a single case where the court refused to return a child based on Article 20. *See Walker v. Kitt*, 900 F. Supp. 2d 849, 863 (N.D. Ill. 2012) (Castillo, J.); *Uzoh v. Uzoh*, No. 11-cv-09124, 2012 WL 1565345, at *7 (N.D. Ill. May 2, 2012) (The Article 20 defense "has *never* been asserted successfully in a published opinion in the United States."). The facts of this case certainly do not warrant this Court to be the first to invoke the Article 20 exception. Invoking Article 20 for anything less than gross violations of human rights would seriously cripple the purpose and efficacy of the Convention. Pérez-Vera Report at ¶¶ 33-34.

Accordingly, because Respondents have not presented sufficient evidence to show that return of the Children would utterly shock the conscience or offend all notions of due process, the Court finds that Respondents have failed to meet their burden in asserting an Article 20 defense.

## CONCLUSION

For the foregoing reasons, the Court finds that Respondents wrongfully retained the Children in the United States, and that Respondents failed to meet their burden of establishing either the "consent or acquiescence," "grave risk," or "age and maturity" defenses under Article 13 of the Convention, or the "public policy" defense under Article 20. Accordingly, the Court finds that the Children must be returned to Mexico and grants Petitioner's Petition for return of the Children (R. 1).

This decision is neither easy nor lightly arrived at. The Court realizes that there are no true winners in this case and that the Children will need appropriate care and supervision to make this transition. Respondents need to comply with this order within ten days. The Court has allowed this time period to avoid any abrupt transition.

The Clerk of the Court is directed to enter a final judgment in favor of Petitioner and against Respondents.

ENTERED: _____

**Chief Judge Ruben Castillo**
**United States District Court**

Dated: **August 11, 2015**

36